SO ORDERED.

SIGNED this 20th day of March, 2015.



*Dale L. Somers*
Dale L. Somers
United States Bankruptcy Judge

___

Opinion Designated for Electronic Use, But Not for Print Publication
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re: | |
| MARK STEPHEN NEIGHBORS, SHELLY KAY NEIGHBORS, and | CASE NO. 11-21003-11 |
| NEIGHBORS INVESTMENTS, INC., | CASE NO. 11-21022-11 CHAPTER 11 |
| DEBTORS. | |
| MARK STEPHEN NEIGHBORS, SHELLY KAY NEIGHBORS, and NEIGHBORS INVESTMENTS, INC., | |
| PLAINTIFFS, | |
| v. | ADV. NO. 14-6082 |
| BANK OF VERSAILLES, and BOV HOLDING COMPANY, | |
| DEFENDANTS. | |

OPINION GRANTING THE DEFENDANTS' MOTION TO DISMISS

# THE DEBTORS' COMPLAINT WITH PREJUDICE

This proceeding is before the Court on the Defendants' motion to dismiss the Plaintiffs' complaint.[1] The Plaintiff-Debtors concede the complaint should be dismissed, but ask that the dismissal be without prejudice. The Defendants contend the complaint should be dismissed with prejudice. The Defendants appear by counsel Kate Whittaker of Shook, Hardy & Bacon, L.L.P. The Plaintiff-Debtors now appear by counsel Camron Hoorfar, although the complaint was signed only by non-attorney Mark Neighbors. The Court has reviewed all the pleadings filed in the proceeding, and concludes the Defendants' request to dismiss the complaint with prejudice should be granted.

**Facts**

On October 14, 2014, Chapter 11 Debtors Mark and Shelly Neighbors and Neighbors Investments, Inc. (initially all acting through Mark Neighbors), filed a complaint against the Bank of Versailles and BOV Holding Company because the Bank of Versailles allegedly received a check payable to Gentle Slopes Partners LLC on September 16, 2009, and held the check until October 14, 2009, before it gave notice of non-sufficient funds, thus failing to meet its midnight deadline for giving notice of the dishonor of the check.[2] The complaint does not say, but papers that Neighbors

---

[1] Doc. 8.

[2] At most, the Court might infer from the complaint that BOV Holding Company is related to the Bank of Versailles in some way so that it might conceivably have some kind of derivative liability to the Debtors if the Bank were liable on one or more of the asserted claims. Since the Court concludes the Bank cannot be liable on the claims at this late date, though, BOV Holding cannot possibly be liable on them either.

Investments, Inc., filed in its main bankruptcy case report that Mark and Shelly Neighbors own 60% of Neighbors Investments.

The Debtors allege Gentle Slopes held an auction on September 7, 2009, and contracted to sell property for $925,000. The winning buyers gave a check for 10% of the purchase price (the Check), written on an account at the Bank of Versailles, and it was deposited at the Bank on September 16. The Bank allegedly did not pay or return the Check until October 17, 2009, when it finally gave notice of dishonor. By holding the Check so long, the Bank allegedly killed the sale. The Debtors claim that because Neighbors Investments owns 50% of Gentle Slopes, its estate[3] is entitled to recover half of the $92,500 Check from the Bank for failing to meet its midnight deadline with respect to the Check.[4] The Debtors say they are bringing the action for Neighbors Investments' bankruptcy estate "as a derivative percentage of their ownership in Gentle Slopes Partners LLC." The Debtor do not claim that the dishonored Check was assigned or transferred to any of them, or that they have any rights in the Check itself except through Neighbors Investments' partial ownership of the payee on the Check, Gentle Slopes. The Debtors also say they are bringing the suit "with the protection of the Doctrine of Equitable Tolling in that Plaintiffs may sue after the statutory time period for filing a complaint has

---

[3]The complaint probably seeks to recover only on behalf of the bankruptcy estate of Neighbors Investments, but is not completely clear on this point. If it is seeking to recover for the Neighborses' personal bankruptcy estate, the reasons why Neighbors Investments can't recover apply even more strongly to the Neighborses.

[4]The complaint says this amount is $41,250, but one-half of $92,500 is actually $46,250.

3

expired if they have been prevented from filing in a timely manner due to sufficiently inequitable circumstances." They do not, however, describe any circumstances that allegedly prevented them from filing their complaint sooner.

In addition to their claim for violation of the midnight deadline, the Debtors allege the Bank is liable to them for negligence and lack of ordinary care. They contend the Bank's mismanagement of its accounts and personnel allowed the Check to be held beyond the midnight deadline before it was dishonored. By holding the Check so the Debtors did not receive any proceeds from it, the Bank allegedly caused the sale of Gentle Slopes's property to fall through. Instead, they continue, the property was sold two years later to a company owned by Senior Executive Officer David Baumgartner for $178,000 less than the September 2009 auction price.[5] They ask for "actual damages" of $42,500[6] plus interest from September 10, 2009, and punitive damages of $89,000[7] plus interest from September 10, 2009. The Debtors ask for fees for attorneys, experts, and accountants, and finally ask for "Compensatory Damages as a multiple of 3 times actual damages for the bank[']s negligence and failure to use ordinary care." As far as the Court

---

[5]The complaint does not say what company Mr. Baumgartner is a Senior Executive Officer of, although it does allege that David G. Baumgartner is on the current Board of Directors of BOV Holding Company. In other litigation in the Debtors' bankruptcy cases, the Court has been advised that Mr. Baumgartner is now the president of the Bank of Versailles; perhaps he was a Senior Executive Officer of that Bank when the Gentle Slopes Check was tardily dishonored.

[6]It is not clear how the Debtors arrived at this amount. Perhaps they meant to claim $46,250, one-half of the amount of the dishonored check.

[7]This amount appears to be one-half of the difference ($178,000) between the price the original buyer agreed to pay ($925,000) and the amount Baumgartner's company allegedly paid for the property ($925,000 minus $178,000).

4

can tell, the failure to pay or return the Check payable to Gentle Slopes before the Bank's midnight deadline is the only action or inaction the Debtors allege constituted negligence on the Bank's part.

In lieu of an answer, the Bank of Versailles and BOV Holding Company filed a motion to dismiss, raising four grounds for dismissal: (1) they were never served with summonses; (2) Mark and Shelly Neighbors, and arguably Neighbors Investments, lack standing to assert an action for violating the midnight deadline because they were not payees on the Check; (3) Mark Neighbors purports to represent Neighbors Investments in this proceeding but he is not an attorney and cannot represent that company, and without an attorney representing it, Neighbors Investments cannot assert any claim against the Defendants; and (4) the Debtors acknowledge in the complaint that the statute of limitations has expired on their claims and they have not identified any grounds for equitable tolling of the statute.

After the motion to dismiss was filed, attorney Camron Hoorfar entered his appearance on behalf of all three Debtors. He filed a motion for additional time to respond to the motion to dismiss, the Defendants' counsel stated that she did not object, and the Court granted the extension. However, Mr. Hoorfar did not file a response by the extended deadline. Instead, a couple of days before the deadline, he emailed the Defendants' counsel to say the Debtors did not plan to file a response, and proposed sending in an agreed order of dismissal without prejudice or letting the Court decide based on the merits of the Defendants' motion.

5

After the Debtors' time to respond to the motion to dismiss had expired, the Defendants filed another motion for dismissal with prejudice. They attached a copy of Mr. Hoorfar's email, and noted the Debtors had not filed a response to the original motion to dismiss. District of Kansas Local Rule 7.4(b), they said, therefore provides for the motion to be decided as an uncontested one, and the rule adds, "Ordinarily, the court will grant the motion without further notice." They also cited Federal Rule of Bankruptcy Procedure 7041, adopting Civil Rule 41(b), which provides that if the plaintiff fails to prosecute, the defendant may move to dismiss the action or any claim against it, and with certain exceptions they say don't apply here, a dismissal under that subsection "operates as an adjudication on the merits." Under either the local rule or Civil Rule 41(b), they conclude, they are entitled to a dismissal of the Debtors' complaint with prejudice.

**Discussion**

The Debtors cured the lack of an attorney for Neighbors Investments when Mr. Hoorfar entered his appearance for all three of them, so the Court will not make the dismissal of this proceeding with prejudice based on that problem. And when a plaintiff fails to make proper service of process on a defendant, courts usually give the plaintiff at least one more chance to do it right, so the Court declines to rely on the service problem as a reason to make the dismissal with prejudice, either. But two of the other grounds for dismissal that the Defendants raised could justify such a dismissal, so the Court has

6

looked at them more thoroughly.[8]

**1. The Debtors' do not have standing to complain about the Bank's failure to meet its midnight deadline for dishonoring the $92,500 Check.**

The complaint states that the Check was payable to Gentle Slopes Partners, not to any of the Debtors, but that the Debtors can allegedly recover on the Check because of Neighbors Investments' ownership of 50% of Gentle Slopes. The complaint cites the Uniform Commercial Code, saying that UCC § 4-301 required the Bank to either pay the Check or return it by its midnight deadline, and that UCC § 400.4-104(a)(10)[9] specified the midnight deadline was midnight of the banking day following the banking day when the Check was presented for payment. The complaint says Gentle Slopes and the Defendants are Missouri entities, and the Defendants are both located at an address in Versailles, Missouri. The parties have not said which state's version of the UCC would apply to the events in dispute, but since the Bank is located in Missouri and the Check was allegedly deposited there, the Court believes Missouri law would apply. However, the Court has seen nothing indicating the relevant Missouri UCC provisions differ from the official version of the UCC, or that any other state's version does, either. Consequently, the Court believes case law from any jurisdiction that interprets those provisions can be persuasive in this situation.

---

[8]The Court has decided not to rely on the Debtors' procedural default in ruling on the Defendants' motion.

[9]The complaint cites § 4-401 of the UCC as specifying the "midnight deadline" for banks, but the phrase is actually defined in § 400.4-104(a)(10) of the Missouri UCC.

As the Debtors contend, § 4-301 of the UCC says that a bank may either pay or return an item before its midnight deadline, but § 4-302 is the more important provision here because it says what happens when a bank fails to meet its midnight deadline. The Missouri version of UCC § 4-302 provides in relevant part:

> (a) If an item is presented to and received by a payor bank, the bank is accountable for the amount of:
>
> > (1) a demand item, other than a documentary draft, whether properly payable or not, if the bank, in any case in which it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, whether or not it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline.[10]

The Bank would have been the payor bank for the Check since it was written on one of its accounts,[11] so it could have been "accountable" under this provision for holding the Check beyond its midnight deadline[12] before sending the notice of insufficient funds. This is a very short deadline: the Bank's midnight deadline for acting on the Check would have been midnight on its next banking day after the banking day when it received the Check — no more than two of its usual business days. September 16, 2009, was a

---

[10] Mo. Ann. Stat. § 400.4-302 (West 2013).

[11] *See* Mo. Ann. Stat. § 400.4-105(3) ("A payor bank is a bank that is the drawee of a draft"); § 400.3-104(f) ("'Check' means (i) a draft, other than a documentary draft, payable on demand and drawn on a bank"); § 400.3-104(e) ("An instrument is a 'note' if it is a promise and is a 'draft' if it is an order"); § 400.4-104(7) ("'Draft' means a draft as defined in Section 400.3-104"); § 400.4-104(8) ("'Drawee' means a person ordered in a draft to make payment"); § 400.4-104(9) ("'Item' means an instrument or a promise or order to pay money handled by a bank for collection or payment")

[12] *See* Mo. Ann. Stat. § 400.4-104(a)(10) (defining a bank's "midnight deadline").

8

Wednesday, so the Bank's midnight deadline expired the next day, September 17, a Thursday, at midnight.

The accountability § 4-302 imposes on a bank for missing this two-day deadline can be extremely harsh, since it can make the bank liable to someone for $90,000 or more, as the Debtors are trying to do here. The UCC does not, however, say to whom the bank is accountable for missing its midnight deadline.[13] Given the stiff penalty, it seems sensible to limit the class of potential plaintiffs who can sue to enforce the liability. And courts have done precisely that.

One of the earliest cases to reject a claim against a bank because the plaintiff asserting it was not within the class § 4-302 is intended to protect, *American Title Insurance Company v. Burke & Herbert Bank & Trust Company*,[14] provides an excellent explanation why the class of plaintiffs that can sue a bank for waiting until after its midnight deadline to dishonor a check should be limited, and who those plaintiffs can be. In that case, a title company provided title insurance through an agent that received money for real estate closings that it deposited in a trust account at a bank.[15] The agent issued three checks drawn on the trust account, but the first of the checks to arrive at the bank caused the account to be overdrawn.[16] It turned out that a vice president of the agent

---

[13]*See* Evan H. Krinick & Howard B. Kleinberg, "Who Can Sue to Enforce the Midnight Deadline?" 118 Banking L. J. 458, 458 (2001).

[14]813 F.Supp. 423 (E.D. Va. 1993).

[15]*Id*. at 425.

[16]*Id*.

had been embezzling from the trust account, but he convinced the bank not to dishonor the checks, claiming a wire transfer that would cover them had been misdirected.[17] The bank held the first check for eight days and the other two for four days before returning them all marked "insufficient funds."[18] The title company had promised the payees on the checks to reimburse them for any losses caused by the agent's fraud or dishonesty, and it did so.[19] Then it sued the bank, first asserting only an equitable subrogation claim, but after receiving assignments of the dishonored checks from the payees, adding a claim to recover under UCC § 4-302 for the bank's violation of its midnight deadline with respect to the checks.

The court ruled the title company was not an entity to which the bank was "accountable" under § 4-302 for failing to meet its midnight deadline. Explaining why it rejected the title company's claims, even though the bank was clearly liable to someone under § 4-302, the court said:

> An examination of the nature of the banking industry's check collection and payment process supports this conclusion. For while the scope of standing to sue under § 8.4–302 [§ 4-302 of the Virginia version of the UCC] is not clearly delineated in the Code provisions, it is nonetheless circumscribed by the practical and economic realities associated with the check collection and payment process. This process, as governed by Article 4 of the U.C.C., typically begins with the payee of a check depositing this check at a bank. From this bank, the "depositary bank," the check is then transferred through one or more intermediary or "collecting" banks until it

---

[17]*Id.*

[18]*Id.*

[19]*Id.* at 425-26.

10

reaches the "payor bank," the bank upon which the check is payable as drawn. In conjunction with each of these transfers, a collecting bank receives a provisional credit from the transferee, with the penultimate bank in the collection chain receiving its provisional credit from the payor bank. Upon final payment by the payor bank, these provisional credits firm up into a final settlement along the chain of collection. Conversely, if a payor bank dishonors and returns a check, these provisional credits are reversed and no final settlement is made. But whatever course of action the payor bank elects, it must take such action within the strict time limits established by § 4–302's midnight deadline rule. *See* Clark, *The Law of Bank Deposits, Collections, and Credit Cards*, ¶ 5.01 (3d ed. 1990). Without these strict time limits, the dependent chain of credit created by presentment of a check would threaten the efficient operation of the banking industry. Thus, it is plain to see that § 8.4–302's insistence on such prompt action inures to the benefit of the general public. Yet it is equally clear that the primary intended beneficiaries are those entities in the check collection and payment process who are entitled to rely on the payor bank's adherence to the midnight deadline requirement. Given this, and given that § 8.4–302 plainly does not confer standing to the public at large, it follows that standing to sue for a § 8.4–302 violation is limited to those entities who, by virtue of their relation to the check transaction, either did suffer, or might have suffered, a loss that falls within the scope of the risk of loss created by the bank's failure to take prompt action in accordance with the statute. In other words, this statute confers standing to sue on a limited class comprised of those involved in the collection and payment of the check at issue who may be directly harmed (but are not necessarily actually harmed) by the failure of the payor bank to adhere to the § 8.4–302 midnight deadline.

Falling squarely within this class is the payee of a check who presents it through the collection chain to a payor bank for payment. A payee clearly has standing to bring suit for the payor bank's failure to pay or return this check in a timely fashion because of its potential reliance on the payor bank's prompt action. Nor does any question of standing arise where the original payee of a check assigns and/or transfers her rights in the instrument to another entity prior to its presentment for payment. In that event, the assignee/transferee simply steps into the shoes of the original payee and is entitled to § 8.4–302's protection once it initiates the collection and payment process. The assignment and transfer of a check before its presentment does not trigger the operation of § 8.4–302. As noted above, it is the potential reliance on payor bank action that arises once a check is

actually presented that provides the basis for standing to sue under § 4–302.

> In light of this principle, [the title company's] acquisition of ownership interests in the checks and written assignments from the original payees does not, under the circumstances presented here, entitle it to bring suit for [the bank's] violation of the midnight deadline requirement. To be sure, the record reflects that the original payees of the returned checks transferred these checks to [the title company], endorsed them pursuant to a negotiation, and subsequently executed written assignments of all rights, title, and interest arising out of these checks in favor of [the title company]. But [the title company] became the transferee and holder of the checks, as well as the assignee of all rights arising from these instruments, well after their untimely return by [the bank] and with full knowledge that they had been dishonored for insufficient funds. At the time of their presentment by the payees, [the title company] had no vested interest in the timely payment or return of these checks. Nor can [the title company] claim to have taken action in reliance on the midnight deadline requirement. By the time checks were acquired by [the title company], the untimely dishonor had already occurred. Thus, where, as here, a party becomes a holder, transferee and assignee of checks after their untimely return by a payor bank, that party has no standing to bring a cause of action for the bank's violation of § 4–302. Limiting standing in this manner does not, in any way, diminish the deterrent sting of § 8.4–302's strict liability rule, for it simply entrusts enforcement of this rule to those with the greatest incentive to enforce compliance.[20]

The court went on to explain that the assignment of the checks to the title company did not give it standing to sue to enforce § 4-302 because a suit under that provision is one to enforce a breach of a statutory duty, not one to collect on a negotiable instrument.[21] The court added that while the original payees on the checks could have sued the bank under § 4-302 instead of recovering their money from the title company, the bank's statutory liability to the payees was not related to the title company's obligations to the payees; in

---

[20]*Id*. at 427-29 (footnotes omitted).

[21]*Id*. at 430.

12

fact, if the bank had timely dishonored the checks, the title company would still have had to reimburse the payees under its agreements with them.[22] In an unpublished decision, the Fourth Circuit affirmed based on the district court's reasoning.[23] Other courts have relied on the district court's decision in reaching similar conclusions.[24]

This Court agrees with the reasoning of *American Title v. Burke & Herbert Bank* and concludes it demonstrates that the Debtors have no standing to sue the Bank for its tardy dishonor of the Check on which Gentle Slopes was the payee. The Debtors have not suggested they were in any way involved in the check collection and payment process before the Check was dishonored, and in fact, do not claim even now that they have become holders of the Check who are entitled to present it for payment. And if they were to obtain the Check now, they would take it with knowledge that it has been dishonored, just like the title company in *American Title*. Under the facts the Debtors have alleged, with respect to the Check, they are simply too far removed from the check collection and payment process to be entitled to enforce the statutory penalty imposed by UCC § 4-302.

**2. The applicable statute of limitations would bar the Debtors' claims against the**

---

[22]*Id.*

[23]1994 WL 224210 (4th Cir. 1994).

[24]*Lawyers Title Ins. Corp. v. United American Bank of Memphis*, 21 F.Supp.2d 785, 807-10 (W.D. Tenn. 1998) (on similar claim by title company against bank, court found *American Title v. Burke & Herbert Bank* "persuasive" and rejected cause of action asserted under Tennessee's version of § 4-302); *Triffin v. Bridge View Bank*, 750 A.2d 136, 137-39 (N.J. Super. Ct. App. Div. 2000) (agreeing with *American Title v. Burke & Herbert Bank* and quoting it extensively, court rejected claim under New Jersey's version of § 4-302 asserted by man to whom check was assigned after it was dishonored); *see also Triffin v. TD Banknorth, N.A.*, 920 A.2d 649, 651 (N.J. 2007) (rejecting § 4-302 claim by assignee of dishonored check for reasons stated in *Triffin v. Bridge View Bank*).

**Bank, and they have not adequately described any circumstances that would make it inequitable to apply that statute to bar their claim.**

Article 4 of the Missouri UCC includes its own statute of limitations, § 400.4-111, which provides: "An action to enforce an obligation, duty, or right arising under this Article must be commenced within three years after the cause of action accrues, and the statutes of limitation in chapter 516 shall not apply." The complaint alleges the Bank did not return the Check until October 14, 2009, making that the last possible day when the claim under § 400.4-302 might have accrued.[25] The complaint was not filed until October 14, 2014, five years after the Check was allegedly returned, and well after the § 400.4-111 time limit had run.

The Debtors have also asserted a negligence claim based on the Bank's delay in returning the Check, although their negligence claim does not allege the Bank did or did not do anything else other than fail to meet its midnight deadline, the circumstance covered by UCC § 4-302. The 7th Circuit has rejected any possibility of avoiding a UCC statute of limitations in such a way, saying:

> Since [the applicable UCC section] fits the facts of the case to a T, no room is left for recharacterizations intended to circumvent the statute of limitations applicable to such claims. It is one thing to fill gaps in the Uniform Commercial Code and another to contradict it by calling a UCC claim something else.[26]

---

[25]As discussed below, the Debtors' claims would actually have accrued almost a month earlier, but for the three-year statute of limitations, that extra month makes no difference.

[26]*Travelers Cas. & Sur. Co. of Amer., Inc., v. Northwestern Mut. Life Ins. Co.*, 480 F.3d 499, 505 (7th Cir. 2007).

14

Because the Debtors' claims are all based on the liability created by § 4-302, they can't avoid the three-year statute of limitations set by UCC § 400.4-111 by contending the Bank's failure to meet its midnight deadline resulted from negligence.

The Defendants say that Missouri Rev. Statutes § 516.120(2) and (4) establish a five-year statute of limitations for claims based on a statutory violation or on negligence. Section 516.120(2) states that it covers a liability created by a statute, and case law from Missouri says § 516.120 governs negligence claims.[27] Missouri Annotated Statutes § 516.100 provides:

> Civil actions . . . can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued; provided, that for the purposes of section 516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered.[28]

Consequently, even if UCC § 400.4-111 did not apply to bar all the Debtors' claims, they had no more than five years from the time their claims against the Bank accrued to bring suit on them.

The complaint might be read to suggest that the statute of limitations did not start to run until the Bank finally returned the Gentle Slopes Check on October 14, 2009, exactly five years before the Debtors filed their complaint. But since the Check was

---

[27]*See, e.g., May v. AC & S, Inc.*, 812 F.Supp. 934, 940 (E.D. Mo. 1993); *Molder v. Trammell*, 309 S.W.3d 837, 840 (Mo. App. 2010).

[28]Mo. Ann. Stat. § 516.100 (West 2014).

presented to the Bank on September 16, 2009, the Bank's midnight deadline would have expired at midnight on September 17 (a Thursday), and the Bank's liability for any later dishonor of the Check would have been ascertainable immediately after that. So the five-year statute of limitations would have commenced to run on September 18, 2009, and expired no later than September 18, 2014, several weeks before the complaint was filed. Since the Debtors have not alleged the existence of any circumstances that might have tolled the running of this statute, their claims against the Bank would be barred even if they had five years to sue on them.

The Debtors' effort to tie the Bank's tardy return of the Check to the sale of Gentle Slopes's property two years later for less money might conceivably be thought to mean the reduced sale price was the last item of damage they suffered as a result of the Bank's delay. However, the Court is convinced that event is much too far removed from the Bank's handling of the Check to possibly be considered to be a result of the Bank's negligence, assuming there was any.

**Conclusion**

For these reasons, the Court concludes the facts alleged in the Debtors' complaint, even if accepted as true, do not show the Debtors have standing to sue the Bank under UCC § 4-302 for failing to meet its midnight deadline with respect to the Gentle Slopes Check. Furthermore, the facts alleged reveal that all the Debtors' claims against the Defendants are barred either by (1) the three-year statute of limitations established by § 400.4-111 of the Missouri UCC, or (2) the five-year statute of limitations established by

Missouri Statutes Annotated § 516.120.  The Debtors have not described any circumstances that might justify equitably tolling either statute of limitations.  With respect to BOV Holding Company, the Debtors have alleged, at most, that its liability derives from the Bank's liability.  Since the Bank is not liable on the Debtors' claims, BOV Holding is not either.  Consequently, the Defendants are entitled to have the Debtors' complaint dismissed with prejudice.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure.  A judgment based on this ruling will be entered on a separate document as required by FRBP 7058 and FRCP 58(a).

# # #

17

Case 14-06082    Doc# 19    Filed 03/20/15    Page 17 of 17